958 F.2d 372
 139 L.R.R.M. (BNA) 2936
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Dexter THOMPSON, Plaintiff-Appellant,
v.
LINDBERG HEAT TREATING CO., DIV. OF LINDBERG CORP., and
International Union, UAW, Defendants-Appellees.
 No. 91-1550.
 United States Court of Appeals, Sixth Circuit.
 March 24, 1992.
 
 Before KENNEDY and BOGGS, Circuit Judges, and EDGAR, District Judge.*
 PER CURIAM.
 
 
 1
 Dexter Thompson filed this suit under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, against his employer, the Lindberg Heat Treating Company, and the International Union, UAW. In this hybrid § 301 claim, Thomson alleges that his collective bargaining representative violated its duty of fair representation and that his employer breached the collective bargaining agreement. The district court granted summary judgment to the defendants in this matter. For the reasons discussed below, we affirm the judgment of the district court.
 
 
 2
 * Dexter Thompson was employed by Lindberg as a "utility worker." As a utility worker, Thompson was not assigned to a specific job, but instead performed whatever tasks were required during his shift. Thompson therefore had to operate various machines throughout the plant. He primarily operated machines known as the "shot blast" and the "Magna-flux."
 
 
 3
 Appellee UAW, along with the local union, were the collective bargaining representatives at Lindberg. The collective bargaining agreement contained a multi-step procedure for processing grievances, which culminated in the submission of a grievance to arbitration. The local union was responsible for the preliminary steps in the grievance procedure. If initial local union efforts were unsuccessful, Lindberg's division manager would meet with representatives of the local and international UAW to discuss the grievance. If the meeting did not resolve the matter, the UAW representatives could submit the grievance to arbitration. The collective bargaining agreement also allowed for various types of discipline for employee misconduct. However, the violation of certain rules, including the deliberate restriction of production, could result in immediate discharge.
 
 
 4
 Prior to the spring of 1988, Thompson was viewed as a generally satisfactory worker who often maintained high production levels. In fact, early in 1988 Thompson burned out the electrical system on the Magna-flux machine by running too many parts through it too quickly. In 1987, Thompson worked a large amount of overtime. In 1988, however, overtime was not as available as in the previous year. Lindberg contends that the overtime issue was the motivating factor in Thompson's change of attitude, leading Thompson to restrict production and eventually resulting in his termination.
 
 
 5
 Thompson maintains that prior to his discharge he was involved in several actions that "placed him in disfavor with the Local UAW officials and with Lindberg." In September 1987, for instance, Thompson and several other employees signed a petition to be sent to the International Union, protesting the local union's failure to insist that the company expedite the grievance procedure. Thompson further states that in January 1988 he, along with other employees, filed a grievance over unsafe conditions in the plant due to inadequate ventilation. In March 1988, Thompson filed another grievance concerning the company's policy on the assignment of overtime, because he felt that policy discriminated against utility men. This grievance was withdrawn by the union. Thompson also began organizing a recall campaign against Paul Villastrigo, the chairman of the local union. Thompson contends that the subsequent handling of the grievance at issue in this case should be viewed against the backdrop of these facts, which he claims illustrate the reasons for the employer's and the union's bias against him.
 
 
 6
 The events that gave rise to this suit took place on May 4 and 5, 1988. On May 4, Thompson was assigned to work on the Magna-flux machine. The Magna-flux is operated by two people. In the machine, parts are energized with an electrical charge and then passed through a kerosene solution with "magna glow particles" suspended in it. The part is then examined under ultraviolet light, showing particles attached to any cracks in the metal. If the part meets specifications, it is demagnetized. Before the completion of his shift of May 4, Thompson received an oral reprimand from his supervisor, Dan Dewberry, for his low production on the machine. Thompson disputed Dewberry's assessment of his job performance and complained that his shoulder and sinuses were bothering him. Dewberry instructed a maintenance man to set up a fan to blow the kerosene fumes away from the Magna-flux machine. Thompson claims that the fan only made things worse. Lindberg and the UAW contend that the May 4 meeting was the first time Thompson had told Dewberry that he had sinus problems since January 1988. Thompson had continued to do his work satisfactorily from January to May despite his alleged sinus problems.
 
 
 7
 The following day, May 5, 1988, Thompson was again assigned to the Magna-flux machine. Several hours after the start of his shift, Thompson was given a written reprimand for his poor production and was warned that he would be terminated if his performance did not improve. Thompson again explained that he had sinus and shoulder problems, which hindered his ability to operate the Magna-flux. He requested a transfer to another machine but was denied. A few hours later, Thompson was discharged for his alleged deliberate restriction of production in violation of the work rules. At no time during these two days did Thompson suggest that any mechanical problem with the Magna-flux machine had caused his low production.
 
 
 8
 On May 6, a grievance was filed on Thompson's behalf and processed in accordance with the terms of the collective bargaining agreement. The basis of the grievance was that Thompson should have been subject to further discipline, not discharge, after he received the second reprimand on May 5. It also alleged that Thompson did not deliberately restrict production, but that his poor performance was the result of medical problems and equipment breakdown. The grievance was not resolved and was submitted to arbitration by the international union.
 
 
 9
 International UAW representative Lloyd Cain represented Thompson at the arbitration hearings. Cain has handled approximately 90 arbitrations in his career. After the hearing, the arbitrator denied Thompson's grievance, noting the lack of any credible evidence corroborating the plaintiff's position that his low production was the result of equipment failures or medical problems. As a result of the arbitrator's decision, Thompson filed this § 301 suit. Thompson continues to argue that production problems were the result of mechanical difficulties with the Magna-flux and problems with his shoulder and sinuses and that Lindberg breached the collective bargaining agreement by terminating him. Thompson also challenges Cain's presentation of this case at arbitration, claiming that Cain only presented two witnesses in support of the grievance and did not present the testimony of several other witnesses and other evidence that would have supported the grievance.
 
 
 10
 This action was originally commenced by Thompson, pro se, against UAW Local 724, Lindberg, and various company and union officials. After retaining counsel, Thompson filed an amended complaint, adding the international UAW as a party. The parties then stipulated to the dismissal of the individually named defendants. In an opinion and order dated October 15, 1990, the district court granted the local union's motion for summary judgment. That order is not involved in this appeal. In an opinion and order dated April 1, 1991, the district court granted summary judgment in favor of the international UAW and Lindberg. Thompson appeals that determination.
 
 II
 
 11
 We review a grant of summary judgment de novo. EEOC v. University of Detroit, 904 F.2d 331, 334 (6th Cir.1990). Summary judgment is appropriate when there are no genuine issues of material fact and where one party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Canderm Pahrmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir.1988). In Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir.1989), a Sixth Circuit panel discussed in detail and summarized the "new era" of summary judgment standard developed by the Supreme Court in Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), Celotex Corp. v. Catrett, 477 U.S. 317 (1986), and Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). First, in order to meet the initial burden for a grant of summary judgment, a movant must show the absence of a genuine issue of material fact for trial. Street, 886 F.2d at 1479. "There is not an issue for trial unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).
 
 
 12
 To meet this standard, a moving party need not support its motion with affidavits or other similar material "negating " the opponent's claim. Celotex, 477 U.S. 317, 323 (1986). Nor must the moving party produce evidence establishing the absence of a genuine issue of material fact; rather, "the burden on the moving party may be discharged by 'showing'--that is pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Id. at 325. Once the moving party meets this burden, the burden shifts to the nonmoving party to set forth specific facts establishing a genuine triable material issue. Gregg v. Allen-Bradley Co., 801 F.2d 859, 861 (6th Cir.1986).
 
 
 13
 In order to overcome a motion for summary judgment, the nonmoving party must present more than a "scintilla" of evidence establishing a genuine material issue of fact. Street, 886 F.2d at 1479. The nonmoving party cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Ibid., quoting Anderson, 477 U.S. at 257. Further, the Street court recognized that the trial court has more discretion than in the "old era" to evaluate the evidence submitted by the nonmoving party. 886 F.2d at 1480. The respondent must do more than show that there is some metaphysical doubt as to the material facts. Further, where the record taken as a whole could not led a rational trier of fact to find for the nonmoving party, summary judgment should be granted. Ibid.
 
 
 14
 As stated above, this action is a hybrid section 301 claim alleging that the collective bargaining representative breached its duty of fair representation and that the employer breached the collective bargaining agreement. Vaca v. Sipes, 386 U.S. 171, 186 (1967). The duty of fair representation requires the union to "serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." Id. at 177. A union must discharge this duty when it bargains with an employer and when it seeks enforcement of the resulting collective bargaining agreement. Ibid. In order to be entitled to judgment on a hybrid section 301 claim, a plaintiff must establish that the union breached its duty of fair representation and that the company breached the collective bargaining agreement. Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 567 (1976); Bagsby v. Lewis Bros., 820 F.2d 799, 801 (6th Cir.1987).
 
 
 15
 To establish a breach of fair representation, the plaintiff must meet the onerous burden of proving that the grievance process was "seriously flawed by the union's breach of its duty to represent employees honestly and without invidious discrimination or arbitrary conduct." Hines, 424 U.S. at 570. The plaintiff must also show that the union's improper conduct undermined the integrity of the arbitration. Ibid. Mere negligence or poor judgment on the part of the union will not support a claim of unfair representation. Poole v. Budd Co., 706 F.2d 181, 183 (6th Cir.1983). In Air Line Pilots Association v. O'Neill, 111 S.Ct. 1127, 1130 (1991) (citations omitted), the Supreme Court recently held:
 
 
 16
 [T]he rule announced in Vaca v. Sipes --that a union breaches its duty of fair representation if its actions are either "arbitrary, discriminatory, or in bad faith"--applies to all union activity, including contract negotiation. We further hold that a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a "wide range of reasonableness" as to be irrational.
 
 
 17
 In other words, the "relevant issue in assessing a union's judgment is not whether it acted incorrectly, but whether it acted in bad faith." Anderson v. Ideal Basic Industries, 804 F.2d 950, 953 (6th Cir.1986).
 
 
 18
 The district court found that Thompson did not establish any genuine issue of material fact with regard to his claim that the International Union breached its duty of fair representation. The district court did not find it necessary, therefore, to consider the second prong of the hybrid 301 claim: that Lindberg breached the collective bargaining agreement. Thompson's claim against the International Union centers on Cain's representation at the arbitration. Thompson alleges that favorable witnesses were not presented and that his medical records were not introduced. According to Thompson, the arbitrator would have reached a different conclusion had this critical evidence been introduced.
 
 
 19
 While every decision made by an official presenting an arbitration case might conceivably affect its outcome, the duty of fair representation is breached only if those tactical decision exhibit arbitrariness, discrimination, or bad faith. E.g., Barr v. United Parcel Service, 868 F.2d 36, 43-44 (2nd Cir.1989), cert. denied, 110 S.Ct. 11 (1990). Therefore, this court's review is limited to determining whether the UAW's decision not to present certain evidence at the arbitration hearing was tainted by the sort of conduct that gives rise to a breach of the duty of fair representation and if so, whether the breach of duty contributed to an erroneous outcome of the arbitration. Taylor v. Ford Motor Co., 866 F.2d 895, 898 (6th Cir.1989).
 
 III
 
 20
 Thompson makes several challenges to Lloyd Cain's performance in preparing and presenting this case to the arbitrator. Thompson contends that he provided Cain with the names of several witnesses who would testify that there were serious mechanical breakdowns on the Magna-flux machine on May 4 and 5. Further, Thompson says he provided Cain with medical records and the names of physicians who could verify that Thompson suffered from shoulder problems and had been treated for his sinus condition. Thompson also told Cain that he suffered from constant sinus infections and was often on medication. He gave Cain the names of other witnesses who would corroborate his physical condition. Cain interviewed several of the witnesses suggested by Thompson, but ultimately decided not to use most of them at the arbitration. Thompson argues that Cain's failure to introduce certain medical records and his failure to call several witnesses regarding his physical problems and the alleged mechanical problems with the Magna-flux amount to a failure to provide fair representation on the part of UAW. We discuss each of these issues in turn.
 
 A. The Medical Evidence
 
 21
 Thompson first argues that Cain inadequately represented him by failing to introduce certain medical records into evidence at the arbitration. With regard to the claim that Cain's decision not to admit certain medical records constituted a failure of adequate representation, the district court stated:
 
 
 22
 The majority of these proposed exhibits are little more than receipts for medical treatment and a list of visits to health care providers. One of the exhibits not introduced at the arbitration hearing is an unfavorable report, dated May 23, 1988, from a chiropractor who had previously treated the plaintiff stating that the plaintiff should be able to perform his customary work despite his alleged shoulder problems. Another one is a May 27, 1988, report from a medical doctor the plaintiff saw for the first time after his discharge, stating that he should begin physical therapy, presumably for his shoulder. However, it does not state that the plaintiff should not perform his usual work. Furthermore, neither report gives any suggestion when or how the alleged injury occurred. The conclusions reached by these two health care providers along with their failure to indicate when the alleged injury occurred would have been explored by defendant Lindberg on cross-examination and could have harmed, rather than helped, the plaintiff's case. Thus, the alleged failure of the UAW representative to introduce them and to build the plaintiff's case around them should be viewed as a legitimate tactical decision, not arbitrary and capricious conduct.
 
 
 23
 Memorandum and Opinion, pp. 7-8.
 
 
 24
 In addition, any medical evidence that could have had a beneficial effect on Thompson's case was introduced by Cain at the hearing. Two documents that listed a chronology of Thompson's medical treatment for his sinuses and shoulder were introduced into evidence. Further, Thompson was allowed to testify to the contents of medical records that were not introduced. According to the district court: "As a result, most, if not all, of the plaintiff's proposed medical evidence was before the arbitrator for his consideration in some form." Id. at 8.
 
 
 25
 More importantly, all of Cain's decisions regarding evidence and witnesses must be viewed in light of Thompson's own testimony at the hearing. Thompson freely admitted at the hearing and at his deposition that no medical practitioner had placed any restrictions on his activities at the time of his discharge. During the first day of the arbitration, Thompson testified that he was under no work restriction, that he had filed no physician statements of any type with Lindberg during 1988, that he was not under a doctor's care, that he had missed no work during 1988 for sinus or shoulder problems, that he was not on any medication, and that he did not ask to be sent home because of any medical problems. These facts support Cain's decision to limit Thompson's medical evidence. Further, with regard to the medical records accumulated by Thompson after his discharge, Cain was relying on his experience that arbitrators tend to disfavor medical evidence that comes into existence after a discharge.
 
 
 26
 Cain also reasonably decided not to call various lay witnesses who allegedly supported Thompson's claim that his ailments were the cause of his low production. Cain determined that it would have been useless to call these witnesses once Thompson had admitted that his activity had not been restricted by any physician prior to his discharge. In the words of the district court: "Since the Court has concluded that the decision of the UAW representative not to give credence to the plaintiff's proposed medical testimony was not a breach of a duty of fair representation, it would be incomprehensible to hold that his failure to call witnesses who would have testified about these matters is arbitrary and capricious conduct." In any event, none of the evidence presented by Thompson of Cain's decisions regarding the medical records or the witness testimony regarding his physical condition are sufficient to raise a genuine issue of material fact. None of the evidence would be sufficient to lead a trier of fact to find that Cain's actions amounted to a breach of the union's duty of fair representation.
 
 B. The Mechanical Problems
 
 27
 Thompson next argues that Cain failed to represent him adequately at the arbitration hearing because Cain did not call several witnesses who Thompson claims would have corroborated his claim that his low production was caused by mechanical problems with the Magna-flux machine. First, it must be recognized that the alleged equipment problems is an after-acquired excuse that Thompson never mentioned to his supervisor before his discharge. Next, it should be noted that Cain interviewed all of the suggested witnesses in Thompson's presence before he made any tactical decisions. Cain analyzed the production records during the days at issue and found that no other employees had trouble meeting production standards. Cain did this even though Thompson never asserted machine breakdown as the cause of his low production during any disciplinary interview on May 4 and 5. In fact, at the hearing Thompson admitted that he had never complained about the production standard on the Magna-flux as being unreasonable, and that he did not give mechanical breakdowns as a reason for his low production when reprimanded and eventually terminated by his supervisor.
 
 
 28
 We note these circumstances because, in our view, the mere fact that the "equipment problem" rationale is an after-aquired excuse would support Cain's decision not to present evidence attempting to establish mechanical breakdown as a cause of low production. If Cain had made a general decision that on these facts it would have been detrimental to Thompson's cause even to argue a "mechanical breakdown" theory, then such a decision would not have risen to the requisite level of arbitrariness, discrimination, or bad faith necessary to establish a genuine issue of material fact regarding an alleged failure of adequate representation by the union. However, in this case, Cain also had sufficient specific reasons for deciding against calling each individual witness suggested by Thompson. There were good reasons for all of Cain's decisions in preparing and presenting this case to the arbitrator. Cain made proper judgments, either prior to or during the first day of arbitration, that much of the evidence and testimony suggested by Thompson would be either unfavorable or duplicative.
 
 
 29
 Appellant argues that Cain should have presented witness who would have testified that the Magna-flux machine suffered mechanical problems. The district court found that the decision not to call these witnesses was based on legitimate tactical reasons and not on bias against Thompson. The district court's reason for its conclusion is sound and deserves to be quoted at length:
 
 
 30
 One of the witnesses not called by the UAW representative would have testified to matters that were not seriously disputed by the plaintiff and defendant Lindberg. These matters were established at arbitration through the testimony of other witnesses. Moreover, this witness had knowledge about the plaintiff's alleged destruction of company property. Since any testimony about these matters would raise serious doubts about the plaintiff's credibility, the mere [possibility] that the arbitrator would permit questioning about these incidents during cross-examination is a valid reason not to call this witness.
 
 
 31
 Another witness would have testified that he observed the magna-flux machine repaired during the plaintiff's shift on the day his discharge. According to the UAW representative, this prospective witness, seven months after the plaintiff's discharge, said during a pre-arbitration interview attended by the plaintiff that he "was driving a lift truck [through the plant] and ... happened to drive by and see that ... [the magna-flux machine] was broken down." However, he was not certain whether he saw the machine being repaired on May 4 or May 5, the day the plaintiff was discharged. As a result, the UAW representative doubted that this prospective witness would be seen by the arbitrator as credible. Instead of offering the testimony of this witness, the UAW representative introduced the magna-flux machine's maintenance and production records at the arbitration.
 
 
 32
 He also had a union steward testify about the alleged breakdowns that occurred at May 5, 1988. Since the proposed testimony of the plaintiff's witness would seem to add little to this evidence the UAW representative's decision not to use it cannot be considered a breach of duty.
 
 
 33
 Memorandum Opinion at 10-11.
 
 
 34
 Two other witnesses that Thompson claims would have testified that the Magna-flux was broken were not called because they had made representations to management that were unfavorable to Thompson's cause. Cain concluded that these witnesses would have harmed the case. The testimony of one of these prospective witnesses was offered by Lindberg in support of its decision to terminate Thompson. The witness had been working on the Magna-flux with Thompson and had complained to management that Thompson's performance was poor and asked for a new assignment. The other witness had also complained to management about Thompson's performance and work habits. The decision not to call either of these witness was certainly legitimate.
 
 
 35
 The record reveals that none of Cain's alleged conduct, even if viewed in a light most favorable to the appellant, meets the standard required to prove that the union violated its duty of fair representation. We cannot say that any of Cain's decisions were arbitrary, discriminatory, or made in bad faith. None of the evidence presented by Thompson of Cain's decisions concerning testimony about the alleged mechanical breakdown of the Magna-flux could lead a rational trier of fact to conclude that the union had breached its duty of fair representation. In sum, Thompson has not presented sufficient evidence to raise a genuine issue of material fact and, therefore, the defendants are entitled to summary judgment.
 
 IV
 
 36
 For the reasons stated, we AFFIRM the district court's grant of summary judgment to the defendants in this case.
 
 
 37
 KENNEDY, Circuit Judge, dissenting.
 
 
 38
 The majority finds that Thompson presents no evidence which could lead a rational trier of fact to conclude the union breached its duty of representation. Because I believe that a factual issue remains, I respectfully dissent.
 
 
 39
 On this appeal, Thompson presents evidence, in the form of affidavits, that the witnesses Cain failed to call to testify would have provided evidence corroborating Thompson's assertions that the production slow down was the result of mechanical problems. These affidavits were signed by the witnesses and dated June 4, 1990. Cain's explanation for why he failed to call various witnesses is disputed by these affidavits.[1] If the court accepts the affidavits as true, which we must under the standards for summary judgment, then Cain is giving a false explanation for why he did not call certain witnesses. A jury, finding the affidavits to be true, could infer from Cain's false testimony that his decision not to call certain witnesses was the result of union animosity towards Thompson. Thus, viewing the evidence in the light most favorable to the non-moving party, we should reverse.
 
 
 
 *
 The Honorable R. Allan Edgar, The United States District Court for the Eastern district of Tennessee, sitting by designation
 
 
 [1]
 For example, Cain states that his decision not to call Herbert Ruedisale was based on Ruedisale's inability to recall the exact date of the breakdown of the Magna-Flux machine. Ruedisale's affidavit indicates that he would have testified that the Magna-Flux was broken and under repair on May 5, 1988